## Michael Chry, Appellee, v. Griffin Wheel Company, Appellant.

### Gen. No. 14,955.

1. MASTER AND SERVANT—*when latter bound to obey order.* A servant is as much bound to obey the order of an assistant foreman as he is to obey the order of the foreman himself.

2. MASTER AND SERVANT—*duty of former as to elevator.* If a plaintiff uses an elevator in control of his master in obedience to an order of such master in the course of his employment and in furtherance of its object, the master is bound to the exercise of reasonable care to see that such elevator is reasonably safe for the use of such servant.

3. MASTER AND SERVANT—*duty of inspection.* If from the evidence the jury might properly find that beams were unsound and defective and that such an inspection as the master in the exercise of reasonable care was required to make, would have disclosed such defective and unsound condition and the master failed to make such inspection, then from such facts the jury might properly find the defendant guilty of negligence.

Action in case for personal injuries. Appeal from the Superior Court of Cook county; the Hon. WILLARD M. McEWEN, Judge, presiding. Heard in this court at the October term, 1908. Affirmed. Opinion filed March 1, 1910. Rehearing denied March 14, 1910.

FRANK M. COX and R. J. FELLINGHAM, for appellant.

F. W. JAROS and FRANCIS J. WOOLLEY, for appellee.

MR. JUSTICE BAKER delivered the opinion of the court.

This is an appeal by the defendant from a judgment

for $4,250 recovered by plaintiff, a laborer in the foundry of defendant, in an action on the case for personal injuries. Plaintiff was on the cab of a freight elevator in said foundry and after the cab had ascended about twenty feet the beams from which it was suspended broke and the cab fell and portions of the broken beams and appliances fell on plaintiff and thereby he sustained the injuries for which he recovered.

The first count of the amended declaration alleged that defendant negligently, etc., permitted said beams to be and remain rotten, partially decayed, weak and insufficiently strong to support said elevator, etc.; that defendant by due care, etc., would have known of the defects, etc.; that plaintiff was ignorant of such defects; that by reason of such negligence, while plaintiff, in the regular course of his employment and in the exercise of ordinary care, etc., was in said elevator, certain of said beams, by reason of their defective condition, broke, fell, etc., and thereby plaintiff was injured, etc.

In the foundry were five elevators and three cupolas. The elevators were used to carry materials from the ground floor to the floor on a level with the tops of the cupolas called the charging floor. Plaintiff's work was to take scrap iron in buggies from the yard where the materials were stored to the charging floor, and he ordinarily used the elevator called the scrap elevator. Tracks for the buggies ran from the yard to a turn-table and from the turn-table to each elevator shaft on the ground floor. On the charging floor similar tracks ran from each elevator shaft to each cupola. In the discharge of his duties, under usual conditions, plaintiff put a load of scrap iron on a buggy, ran it on a track to the turn-table, thence to the scrap elevator and went on the cab with the buggy. He then started the elevator and when the cab reached the charging floor stopped the elevator and ran his

buggy to the proper cupola and threw its load into the cupola.

The elevator which fell was called the south elevator and was used to carry up pig iron and broken car wheels. The man or men who ran a buggy loaded with such materials on that elevator, did not go up on the cab, but gave a signal to a man on the charging floor and he started the elevator. When the cab reached the charging floor it stopped automatically and the buggy was taken off by men on that floor, unloaded and the empty buggy sent down on the elevator to the first floor. On the day of the accident plaintiff and his helper started up with a loaded buggy on the scrap elevator. When the car had gone up about seven feet it stopped on a level with a platform. Plaintiff and his helper left the cab and by way of the platform and a stairway returned to the first floor. They there loaded another buggy and brought it to the foot of the scrap iron elevator shaft, and found that the cab was in the same place that it was when they left it. The testimony is conflicting as to what occurred between the time plaintiff came to the scrap iron elevator shaft with such loaded buggy and the time the elevator fell. Plaintiff and other witnesses called a buggy load of iron a "charge." Plaintiff testified that he stood at the scrap elevator shaft with his charge five minutes; that "Mike," the foreman of the charging floor, then called to him from that floor to push the charge to the south elevator. The "Mike" mentioned by the plaintiff was Michael Sael, who was called as a witness for the defendant and testified that he was general foreman on the charging floor and had full control over the men, that Butler was his assistant down in the yard, and had direct charge of the men who took the material to the elevator and sent it up to the charging floor. Plaintiff further testified that on receiving such order he took the buggy to the turn-table, thence to the south elevator, placed it on the cab and went on the cab with his helper; that he

started the elevator, ran it to the charging floor and then ran the buggy to the cupola into which he had been unloading iron, and unloaded it, and in doing so passed within eight feet of Sael; that he then returned to the elevator, went down on it, reloaded his buggy and went with it to the scrap elevator; that that elevator was just as he had left it, and he then went with his buggy by way of the turn-table to the south elevator, went on the cab with the buggy and his helper and started the elevator; that the cab went up fifteen or twenty feet and then fell. Plaintiff's helper, who was on the cab when it fell, was a Hungarian who began work that day, and he was not called as a witness.

For the defendant Sael testified that he did not direct plaintiff to go to or use the south elevator. O'Brian, who had charge of the elevators and their machinery, testified that the scrap elevator stopped because a certain heavy belt was off; that it stopped fifteen or twenty minutes before the south elevator fell; that he went to the machine shop and got six or eight men to put the belt on; that when he came into the foundry he saw plaintiff and his helper on the south elevator with a load of scrap iron; that he told them they could not use that elevator and to go to their own elevator; that they took the buggy off and took it to the scrap elevator; that he went upstairs and got the belt on and had the motor started, but the belt came off; that he ran down stairs and found plaintiff and his helper going back with the buggy to the south elevator; that he told them to go back to their own elevator, that they could not take it up on the south elevator, and that he helped to push the buggy part way back towards the scrap elevator; that the men got the belt on again, and a very short time afterwards the south elevator fell. Kennedy, a witness for defendant, testified that he saw O'Brian motion with his hands to plaintiff to keep off from the south elevator. Plaintiff on rebuttal testified that

O'Brian did not tell him or motion to him to keep off of the south elevator.

Plaintiff's testimony as to how he came to use the south elevator was consistent and reasonable. He was paid by the day. When the scrap elevator stopped he went to the yard and brought another loaded buggy to the scrap elevator, and could do nothing more without using an elevator. Unless ordered to use another elevator no reason appears why he should not have waited at the scrap elevator until that elevator was again ready for use. Plaintiff's conduct as described by O'Brian was most remarkable. Ordered to take his buggy off from the south elevator and take it to the scrap elevator, he obeyed the order and yet was seen by O'Brian a few minutes later going back to the south elevator, again ordered to go back to the scrap elevator and told that he could not use the south elevator, he started back towards the scrap elevator, O'Brian helping to push the buggy some distance, and then again went back to the south elevator.

Sael was plaintiff's foreman. It is immaterial that Butler was Sael's assistant and in direct charge of plaintiff and the men with whom plaintiff worked. Plaintiff was as much bound to obey a direct order of Sael as he was an order given to him through Butler. Plaintiff's act in using the south elevator was not an act done for his own benefit or convenience, but one done for the defendant and in the furtherance of the objects of his employment.

We think that from the evidence the jury might properly find that plaintiff used the south elevator in obedience to the order of the defendant, in the course of his employment and in furtherance of its objects. The defendant therefore owed to the plaintiff the duty to use reasonable care to see that said south elevator was reasonably safe for the use plaintiff was directed to make of it.

At the corners of the elevator shafts were posts. Beams ran from one corner post to the post diagonally

opposite and rested on the tops of the posts. These beams were of yellow pine, were about fifteen feet long, six inches thick, sixteen inches wide, and stood on edge, five inches apart. From these beams the cab of the elevator was suspended, and plaintiff's injury was the direct result of the breaking of said beams. The beams had been in use fifteen years. The usual weight of the loads of car wheels carried on the south elevator was about 7,000 pounds. The load when the elevator fell was about 3,000 pounds exclusive of the two men. The evidence for the plaintiff tended to show that an examination of the broken ends of the beams after they fell showed that the beams were rotten, worm eaten, and showed evidences of old cracks and breaks. The evidence for the defendant tended to show that the breaking strength of the beams was 45,000 pounds; that with bearings eleven feet apart they ought to sustain eight or ten tons; that an inspection of the broken ends of the beams disclosed no evidence of rottenness, old breaks, cracks or other defect of any kind. Defendant carefully preserved in a vault the broken beams for a considerable time, but having occasion to use the vault for other purposes, the beams were removed and it was claimed were lost, and they were not produced at the trial.

The evidence for the defendant wholly fails to explain or account for the breaking of the beams. It is true that Butler testified that he saw two fresh marks on the ends of beams next to the elevator shaft, and it is contended by appellant that pieces of iron from plaintiff's buggy became wedged between the cab and the end of the beams and that this caused the breaking of the beams. Opposed to this testimony was the testimony of defendant's witness O'Brian, that he noticed marks on the ends of the beams at the places mentioned by Butler, and that they were old marks covered with dust and dirt; the testimony of Basener, another witness for defendant, who had charge of the repairs on the elevators, that he went

over all the wood-work to see whether the elevator caught anywhere and so might have caused the accident, and found only old marks; found nothing that appeared as if it might have had anything to do with the accident, and the testimony of plaintiff that no piece of iron was between the cab and any timber on the side of the shaft. Clearly on this evidence the contentions of appellant cannot be sustained. The breaking strain of the beams, if sound, was 45,000 pounds; in that condition and with the bearings eleven feet apart they would carry eight to ten tons. Yet these beams broke with a load of only about 3,500 pounds, under usual conditions and circumstances. We think that the fact that the beams broke under such conditions, together with the other evidence was evidence from which the jury might properly find that the beams were not sound, but were defective and unsound, as alleged by plaintiff.

The duty of inspection was on the defendant. If from the evidence the jury might properly find that the beams were unsound and defective and that such an inspection as the defendant, in the exercise of reasonable care, was required to make would have disclosed such defective and unsound condition, and that the defendant failed to make such inspection, then from such facts the jury might properly find the defendant guilty of negligence.

There is no evidence that the defendant ever made any inspection as to the condition of the beams other than by having an inspector go on or near the beams and look at them; no evidence that defendant ever caused them to be struck with a hammer or scratched with an awl or other small piece of iron or steel, or ever used any of the means in common use by ship carpenters and other workers in wood to determine whether a beam or other piece of timber is sound through and through. We think that the question whether such an inspection as the defendant, in the exercise of reasonable care, was required to make of

the beams in question, in view of their situation and use, would have disclosed the defective condition of the beams, was a question of fact for the jury, on which the verdict must be held conclusive. We cannot, on the evidence in this record, say that the verdict is against the evidence or not supported by sufficient evidence, nor that the damages are excessive.

We find no reversible error in the rulings of the court on evidence or in the instructions to the jury.

The record is in our opinion free from reversible error, and the judgment will be affirmed.

*Affirmed.*